USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/19/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                   :
STATE OF NEW YORK and CITY OF NEW    :
YORK, *ex rel.* ELIZABETH A. JACOBSON,   :
                                                   :
                          Plaintiffs,   :
                                                   :                   14-CV-914 (VSB)
                        - against -                        :
                                                   :             **MEMORANDUM & ORDER**
WELLS FARGO NATIONAL BANK, N.A,   :
and WELLS FARGO ASSET SECURITIES   :
CORPORATION,   :
                                                   :
                                      Defendants.   :
------------------------------------------------------------X

Appearances:

Peter J. Gallagher
Julie S. Martin
Johnson Gallagher Magliery LLC
New York, New York
*Counsel for Relator*

Eric Seiler
Daniel B. Rapport
Sarah F. Foley
Friedman Kaplan Seiler & Adelman LLP
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

       Before me is the Motion to Dismiss of Defendants Wells Fargo National Bank, N.A., and Wells Fargo Asset Securities Corporation (collectively, "Wells Fargo" or "Defendants"). (Doc. 33.) The Complaint fails to state a claim upon which relief can be granted under the New York False Claims Act ("NYFCA") because it does not allege facts supporting a reasonable inference that Defendants used or made a false statement or record. Accordingly, for the reasons stated below, Defendants' Motion to Dismiss is GRANTED.

I.     **<u>Background</u>**

In this *qui tam* action brought under the NYFCA on behalf of the State of New York and the City of New York, Relator Elizabeth Jacobson ("Relator"), a former Wells Fargo employee, (Compl. ¶ 33),[1] challenges the tax-exempt status of certain trusts created to securitize residential mortgages originated by Wells Fargo.

Relator alleges that Wells Fargo engaged in "rampant fraud" in originating and underwriting subprime mortgage loans. (Compl. ¶ 23.)[2] For example, with the knowledge, encouragement, and guidance of senior management, Wells Fargo loan officers routinely inflated applicants' income and assets on applications, falsified applicants' wage statements, fabricated credit reports, and failed to verify applicants' job titles and salaries. (*See, e.g.*, *id.* ¶¶ 24-40.) Wells Fargo aggregated mortgages that it originated and underwrote, along with mortgages it purchased from other banks, for the purpose of securitizing them and selling them to investors in the mortgage-backed securities market. (*Id.* ¶¶ 62-63.) Wells Fargo National Bank sold the aggregated loans to Wells Fargo Asset Securities Corporation, which in turn deposited them in New York common law trusts created specifically for this purpose (the "Wells Fargo Trusts" or the "Trusts"). (*Id.* ¶¶ 63-65.) The Wells Fargo Trusts became the owners of the mortgages and had the right to receive the payments of principal and interest associated with the loans. (*Id.* ¶ 69.) Certificates in the Trusts were sold to investors, who in turn had the right to receive

---

[1] "Compl." refers to the Complaint. (Doc. 2, Ex. 1.) This factual summary is drawn from the allegations of the Complaint. My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] Relator's allegations pertain to both subprime mortgages, i.e., loans to borrowers with poor credit, and "Alt-A" mortgages, i.e., loans to borrowers who had satisfactory credit but had difficulty satisfying the documentation requirements for a prime mortgage rate. (*See* Compl. ¶ 18.) For convenience, I refer to the mortgages that are the subject of this litigation collectively as "subprime" mortgages. The most common subprime loan originated by Wells Fargo was a 2/28 adjustable rate mortgage, meaning that the interest rate would be fixed for two years and variable for the remainder of the thirty-year term. (*Id.* ¶¶ 16-17.) However, Wells Fargo also offered fixed-rate mortgages and other kinds of adjustable rate mortgages to subprime borrowers. (*Id.* ¶ 17.)

payments of principal and interest from the Trusts.  (*Id.* ¶¶ 66-69.)  The Trusts at issue in this litigation contain approximately $38 billion in securitized mortgages.  (*See id.* ¶ 2.)

The Wells Fargo Trusts are designed as Real Estate Mortgage Investment Conduits ("REMICs").  A REMIC is any entity that satisfies certain requirements set forth in the Internal Revenue Code, including that "substantially all of [its] assets . . . consist of qualified mortgages and permitted investments."  26 U.S.C. § 860D.  REMICs do not pay federal income tax.[3]  *Id.* § 860A.  New York State and New York City also exempt from taxation any "entity that is treated for federal income tax purposes as a real estate mortgage investment conduit, hereinafter referred to as a REMIC, as such term is defined in section 860D of the [I]nternal [R]evenue [C]ode."  N.Y. Tax Law § 8; N.Y.C. Admin. Code § 11-122.

The premise of Relator's lawsuit is that the Wells Fargo Trusts do not properly qualify as REMICs because the fraudulently originated subprime mortgages they own are not "qualified mortgages" under Internal Revenue Service (IRS) regulations.[4]  (Compl. ¶¶ 75-80); *see* 26 C.F.R. § 1.860G-2(f).  Relator alleges that each of the Wells Fargo Trusts annually claimed federal tax-exempt status by filing an IRS Form 1066 (a "1066"), the special tax return for REMICs.  (Compl. ¶¶ 1, 6, 82.)  Relator alleges that all of the 1066s filed by all of the Wells Fargo Trusts were false because none of the Trusts actually qualified as a REMIC.  (Compl. ¶ 82.)  Relator claims that on the basis of these false filings, the Wells Fargo Trusts were wrongly exempted from New York State and New York City franchise and corporate taxes they otherwise would have been required to pay.  (*See id.* ¶¶ 80-81.)  Relator therefore alleges that Wells Fargo fraudulently deprived the State and City of roughly $1.5 billion in tax revenue to

---

[3] A REMIC's income is taxed on a pass-through basis when investors receive it.  *See* 26 U.S.C. §§ 860A(b), 860B.

[4] I discuss the definition of "qualified mortgage" and the relevant IRS regulations in further detail in Section IV.B, *infra*.

which the State and City were entitled.  (*See* Compl. ¶¶ 82-89.)  This is known as a "reverse false claim," whereby a party may be found liable for false statements designed to conceal, reduce, or avoid an obligation to pay money or property to the government.  *See* N.Y. State Fin. Law § 189(1)(g); *State of New York ex rel. Seiden v. Utica First Ins. Co.*, 943 N.Y.S.2d 36, 39 (App. Div. 2012).  Relator pleads two causes of action:  (1) a reverse false claim under § 189(1)(g), and (2) conspiracy to violate § 189(1)(g), *see* N.Y. State Fin. Law § 189(1)(c).

## II.     Procedural History

Relator initiated this *qui tam* action under the NYFCA, N.Y. State Fin. Law § 187 *et seq.*, by filing a Complaint in the Supreme Court for the State of New York, County of New York.  (*See* Compl.)  The New York Attorney General declined to intervene to prosecute the action.  (Doc. 35 Ex. 1); *see* N.Y. State Fin. Law § 190(2)(c).

On February 13, 2014, Defendants filed a Notice of Removal in this Court, pursuant to 28 U.S.C. §§ 1441(a) and 1446, asserting that the Court had federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1340.  (Doc. 2.)  Relator subsequently filed a Motion to Remand the action to state court on March 24, 2014, arguing that the Court lacked subject-matter jurisdiction over Relator's state law claims. (Doc. 13).  Defendants filed their opposition on April 24, 2014, (Doc. 22), and Relator filed her reply on May 8, 2014, (Doc. 24).  I held oral argument on the Motion to Remand on May 22, 2014, and I denied Relator's Motion to Remand on the record and stated I would follow-up with a decision detailing my reasoning.  (Doc. 28, at 50-51.)  On June 16, 2014, I issued a Memorandum & Order denying the Motion to Remand on the basis that Relator's state law claims necessarily raised a substantial and disputed issue of federal law and therefore gave rise to subject-matter jurisdiction, *see Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).  (Doc. 27).

On July 11, 2014, Defendants filed the instant Motion to Dismiss and a memorandum of law, affirmation, and exhibits in support thereof. (Docs. 33-35.) Relator filed her memorandum in opposition on August 15, 2014, (Doc. 37), as well as a letter identifying supplemental authority in support of her position on August 28, 2014, (Doc. 38). Defendants filed their reply on September 5, 2014. (Doc. 39.)

### III.  Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

## IV. <u>Analysis</u>

Defendants move to dismiss on two independent grounds. First, regardless of whether the Trusts actually satisfy the statutory definition of a REMIC, they were "treated for federal income tax purposes as [REMICs]" by the IRS and were therefore properly exempt from State and City taxes. N.Y. Tax Law § 8; N.Y.C. Admin. Code § 11-122; (*see* Ds' Mem. 5-9).[5] Second, the Wells Fargo Trusts are in fact REMICs because the allegedly fraudulently originated mortgages owned by the Trusts are still "qualified mortgages" under the Internal Revenue Code. 26 U.S.C. § 860D; (*see* Ds' Mem. 9-19).

Before proceeding further, I must decide which argument to address first. Defendants' first argument appears to raise a question of state and municipal statutory interpretation: does New York law afford tax-exempt status to any entity that files as a REMIC, absent adverse action by the IRS, or must the entity actually be a REMIC to be exempt from State and City taxes? Defendants' second argument, by contrast, raises a question of federal statutory and regulatory interpretation: are fraudulently originated mortgages "qualifying mortgages," such that the Wells Fargo Trusts actually satisfy the definition of a REMIC under the Internal Revenue Code? The Court only has subject-matter jurisdiction over this action because of the "substantial questions of federal law" implicated by Relator's state law claims, which "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable & Sons Metal Prods.*, 545 U.S. at 312; (*see* Doc. 27). Accordingly, it would be preferable to resolve Defendants' motion on federal law grounds, if possible, rather than to rule on questions of state law that the New York courts have not directly addressed.

Yet Defendants frame their state law argument as a challenge to Relator's Article III

---

[5] "Ds' Mem." refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss. (Doc. 34.)

6

standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendants argue that, because the State and City have chosen by statute not to tax any entity that the IRS treats as a REMIC, Relator has failed to allege that the failure to pay taxes by the Wells Fargo Trusts has injured a legally cognizable interest of the City or State. (*See* Ds' Mem. 5-6.) If Relator lacks Article III standing, I may not exercise jurisdiction over her claims. *See Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006) (noting that Article III standing is a "limitation on the authority of a federal court to exercise jurisdiction" even though "lack of Article III standing and subject matter jurisdiction are distinct concepts"); *see also Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) ("If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim."). Accordingly, because Defendants' frame their state law argument as a challenge to Relator's Article III standing to sue, I address it before considering the merits of Relator's claims.[6] *See Alliance for Envtl. Renewal*, 436 F.3d at 85 ("[A] district court must generally . . . establish that it has federal constitutional jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits."). However, because Defendants confuse Relator's standing to sue with whether she will ultimately prevail on her claim, I can resolve Defendants' standing argument without addressing disputed issues of state law.

    **A.**    *Relator has Article III standing to sue.*

To state a claim for "reverse false claim" liability under the NYFCA, Relator must allege

---

[6] It is not clear why Defendants, having removed this action to federal court and having opposed Relator's efforts to remand it to state court, are now disputing whether Relator has Article III standing to sue in federal court. Nonetheless, because Article III standing affects my ability to exercise jurisdiction, I cannot simply disregard Defendants' arguments. *See Cent. States Se. & Sw. Areas Health & Welfare Fund*, 433 F.3d at 198 ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*.").

facts supporting a reasonable inference that: (1) "the defendant[s] made, used, or caused to be used a record or statement to conceal, avoid, or decrease an obligation to the government; (2) that the statement or record was false; (3) that the defendant[s] knew that the statement or record was false; and (4) that the state suffered damages as a result." *State of New York ex rel. Seiden*, 943 N.Y.S.2d at 40 (alterations omitted). Because the NYFCA parallels the federal False Claims Act ("FCA"), "it is appropriate to look toward federal law when interpreting the New York act."[7] *Id.* at 39. Courts interpreting the parallel provision of the federal FCA have required plaintiffs to demonstrate that the government was "owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used. . . . [T]o be subject to the penalties of the [FCA], a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness." *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997); *see United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 332 (S.D.N.Y. 2004); *United States ex rel. Capella v. Norden Sys., Inc.*, No. 3:94-CV-2063, 2000 WL 1336487, at **10-11 (D. Conn. Aug. 24, 2000); *see also People ex rel. Schneiderman v. Bank of N.Y. Mellon Corp.*, 977 N.Y.S.2d 668 (N.Y. Sup. Ct. 2013) (table) (requiring the same under the NYFCA). Accordingly, to plead "reverse false claim" liability under the NYFCA, Relator must allege that Defendants owed the State or City a legal obligation at the time Defendants made an allegedly false statement—here, the filing of any of the allegedly false 1066s by any of the Wells Fargo Trusts.

Defendants argue that Relator lacks Article III standing because she has failed to allege

---

[7] The federal False Claims Act does not apply to "claims, records, or statements made under the Internal Revenue Code of 1986." 31 U.S.C. § 3729(e); *see United States ex rel. Lissack v. Sakura Global Capital Mkts., Inc.*, 377 F.3d 145, 152 (2d Cir. 2004) (discussing the so-called "Tax Bar" to federal False Claims Act cases). The NYFCA, however, applies to claims, records, or statements made under the tax law if the defendant's net income or sales exceed $1 million and the damages alleged exceed $350,000. N.Y. State Fin. Law § 189(4)(a). Relator has alleged that those conditions are satisfied here. (*See* Compl. ¶¶ 86-89.)

8

that the State or City suffered injury in fact to a cognizable legal interest. According to Defendants, when the State and City granted tax-exempt status to any entity "treated for federal income tax purposes" as a REMIC, N.Y. Tax Law § 8; N.Y.C. Admin. Code § 11-122, the State and City "understood that they were deferring to the federal government to determine" whether an entity is in fact a REMIC. (Ds' Mem. 6.) Because, Defendants argue, the City and State abdicated any responsibility for determining whether the Trusts were in fact REMICs, they were owed no taxes from the Wells Fargo Trusts so long as the IRS treated them as REMICs. (*Id.* at 8.)

The authority relied upon by Defendants, *SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516 (S.D.N.Y. 2013), *aff'd*, 548 F. App'x 741 (2d Cir. 2014), does not support the proposition that Relator lacks Article III standing. In *SC Note Acquisitions*, the plaintiff sought relief on the basis that Defendants' alleged wrongdoing would cause a REMIC to lose its tax-exempt status. *See* 934 F. Supp. 2d at 521-22. The court concluded that the plaintiff failed to satisfy the Article III case or controversy requirement—whether on standing or ripeness grounds—because the alleged harm to plaintiff was entirely hypothetical, as the IRS had not yet taken adverse action against the REMIC such that it lost its tax-exempt status or had any tax liability imposed. *See id.* at 526-27. Here, by contrast, Relator alleges an actual injury that has already occurred: the State and City were entitled to receive taxes from the Wells Fargo Trusts, but were deprived of that revenue when the Trusts allegedly fraudulently obtained tax-exempt status as REMICs through the filing of the 1066s.

Defendants appear to conflate whether Relator has properly alleged Article III standing with whether Relator is ultimately correct on the merits that the State and City were actually owed the taxes at issue. The two are entirely separate issues since Relator could properly allege

9

Article III standing even if she eventually fails to prevail on the merits.  The doctrine of Article III standing embodies separation-of-powers principles and aims to ensure that the courts do not become forums for the expression of generalized public grievances, so "[t]he standing inquiry focuses on whether the plaintiff is the proper party to bring . . . suit."  *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003) (alterations in original) (internal quotation marks omitted).  There is no question that the State and City, on whose behalf Relator has initiated this action, are the proper parties to seek recovery of revenues they allegedly would have received but for Defendants' false filings.  Stated differently, there is no dispute that if 1066s had not been filed the State and City would have been owed taxes.  It also follows that Relator has Article III standing to assert the claim on behalf of the State and City because a *qui tam* plaintiff acts as a partial assignee of the government's damages claim and thereby acquires a personal stake in the litigation.  *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773-74 (2000).  I therefore conclude that Relator has Article III standing to sue, and I need not address whether state law abdicates all responsibility to the IRS for determining whether an entity has properly claimed REMIC status.

> **B.**     *Relator has not stated a claim upon which relief can be granted.*

Defendants argue that, because the Wells Fargo Trusts qualified as REMICs under the Internal Revenue Code and its implementing regulations, the 1066s filed by the Trusts were not false, and Relator has failed to allege the false statement or record necessary to state a claim under the NYFCA, *see State of New York ex rel. Seiden*, 943 N.Y.S.2d at 40.  (*See* Ds' Mem. 9-19.)  I agree.

> **1.     Applicable law and relevant allegations**

As part of the Tax Reform Act of 1986, Congress added provisions to the Internal

Revenue Code that recognized a new type of entity: the REMIC. *See* Pub. L. 99-514, tit. VI, § 671(a), 100 Stat. 2085, 2308 (1986). Congress "recognize[d] the increasing extent to which real estate mortgages [were] being traded on secondary markets and the increasing extent to which multiple-class arrangements [were] used in the 'packaging' of mortgages," and it sought to resolve "considerable uncertainty concerning several aspects of the Federal income tax treatment of these types of securities." S. Rep. No. 313, 99th Cong., 2d Sess. 791 (1986). It concluded that "the best method for doing so [was] to provide a new type of vehicle for the issuance of such multiple class securities." *Id.* This vehicle would not be taxed at the entity level; its income would only be taxed when received by shareholders. *See id.* Congress envisioned that the REMIC would be the "exclusive" vehicle for "the issuance of multiple class securities backed by real property mortgages," and that the form of REMIC needed to be "flexible enough to accommodate most legitimate business concerns while preserving the desired certainty of income tax treatment." *Id.* at 792. Simply put, Congress sought to promote the development of the market for mortgage-backed securities.

Under the Internal Revenue Code, a REMIC is defined, in pertinent part, as any entity "substantially all of the assets of which consist of qualified mortgages and permitted investments." 26 U.S.C. § 860D(a)(4). The statute further defines a "qualified mortgage," in pertinent part, as "any obligation (including any participation or certificate of beneficial ownership therein) which is principally secured by an interest in real property." *Id.* § 860G(a)(3)(A). Finally, the Code introduces but does not define the term "defective obligation." It provides that a REMIC may either repurchase a "defective obligation" or may substitute a "qualified replacement mortgage," which shares the relevant characteristics of a qualified mortgage, in the place of a defective obligation. *Id.* §§ 860F(a)(2)(A)(i), 860G(a)(4)(B)(ii).

11

IRS regulations further define the terms "qualified mortgage" and a "defective obligation" and the interaction between them. An obligation is "principally secured by an interest in real property," and is therefore a qualified mortgage, if the market value of the interest in real property securing the obligation is at least 80 percent of the issue price of the obligation, either at the time it was originated or at the time it was transferred to the REMIC. *See* 26 C.F.R. § 1.860G–2(a)(1)(i). This is known as the "80 percent test" for determining whether an obligation is principally secured by an interest in real property. *Id.* An obligation can also be principally secured by an interest in real property if it satisfies the "alternative test," meaning that "substantially all of the proceeds of the obligation were used to acquire or to improve or protect an interest in real property that, at the origination date, is the only security for the obligation." *Id.* § 1.860G–2(a)(1)(ii).

IRS regulations define a "defective obligation," as that term is used in 26 U.S.C. § 860F(a)(2) and § 860G(a)(4)(B)(ii), as a mortgage with any of the following defects:

> (i) The mortgage is in default, or a default with respect to the mortgage is reasonably foreseeable.
>
> (ii) The mortgage was fraudulently procured by the mortgagor.
>
> (iii) The mortgage was not in fact principally secured by an interest in real property within the meaning of paragraph (a)(1) of this section.
>
> (iv) The mortgage does not conform to a customary representation or warranty given by the sponsor or prior owner of the mortgage regarding the characteristics of the mortgage, or the characteristics of the pool of mortgages of which the mortgage is a part. A representation that payments on a qualified mortgage will be received at a rate no less than a specified minimum or no greater than a specified maximum is not customary for this purpose.

26 C.F.R. § 1.860G–2(f)(1). I refer to these defects as the "Default Defect," the "Fraud Defect," the "Real Property Defect," and the "Customary Warranties Defect," respectively. Crucially for present purposes, the regulation goes on to state:

> If a REMIC discovers that an obligation is a defective obligation, and if the defect is one that, had it been discovered before the startup day, would have prevented the obligation from being a qualified mortgage, then, unless the REMIC either causes the defect to be cured or disposes of the defective obligation within 90 days of discovering the defect, the obligation ceases to be a qualified mortgage at the end of that 90 day period. . . . [E]ven if the REMIC holds the defective obligation beyond the 90 day period, the REMIC may, nevertheless, exchange the defective obligation for a qualified replacement mortgage so long as the requirements of [28 U.S.C. §] 860G(a)(4)(B) are satisfied. If the defect is one that does not affect the status of an obligation as a qualified mortgage, then the obligation is always a qualified mortgage regardless of whether the defect is or can be cured. For example, if a sponsor represented that all mortgages transferred to a REMIC had a 10 percent interest rate, but it was later discovered that one mortgage had a 9 percent interest rate, the 9 percent mortgage is defective, but the defect does not affect the status of that obligation as a qualified mortgage.

*Id.* § 1.860G–2(f)(2).

Relator alleges in the Complaint that the mortgages held by the Wells Fargo Trusts were "defective obligations," within the meaning of these regulations, in two respects. First, default on the mortgages held by the trusts was reasonably foreseeable, *id.* § 1.860G–2(f)(1)(i), because Wells Fargo falsified the bona fides of unqualified borrowers who could not actually afford the loans. (Compl. ¶ 76.) Second, in a variety of ways, the mortgages did not conform to customary representations or warranties regarding their characteristics. 26 C.F.R. § 1.860G–2(f)(1)(iv). For instance, the mortgages did not comply with Wells Fargo's representation that the mortgages were underwritten in accordance with Wells Fargo's stated guidelines, or with Wells Fargo's warranty that it had verified borrowers' assets with respect to certain loans. (Compl. ¶ 79.) These purported defects, accepted as true on a Motion to Dismiss, would unquestionably make the mortgages held by the Wells Fargo Trusts "defective obligations" under 26 C.F.R. § 1.860G–2(f)(1). The disputed legal issue is whether mortgages with these defects were not "qualified" under 26 U.S.C. § 860G(a)(3)(A), in which case the Trusts were not REMICs, or whether such mortgages were simultaneously "defective" and "qualified," in which case the Trusts were

13

REMICs.

### 2. A mortgage is not "qualified" only if it is not principally secured by an interest in real property.

The IRS regulation defining a "defective obligation" does not alter or limit the statutory definition of a "qualified mortgage" as "any obligation . . . which is principally secured by an interest in real property." 26 U.S.C. § 860G(a)(3)(A). Rather, the regulation enumerates certain defects that render a mortgage "defective" without jeopardizing its status as "qualified." The only defects alleged in the Complaint are of this type, i.e., rendering mortgages defective but qualified.

The text of the regulation makes clear that only some defects render a mortgage not qualified. If a REMIC discovers a "defect . . . that, *had it been discovered before the startup day, would have prevented the obligation from being a qualified mortgage*, then, unless the REMIC either causes the defect to be cured or disposes of the defective obligation within 90 days of discovering the defect, the obligation ceases to be a qualified mortgage at the end of that 90 day period." 26 C.F.R. § 1.860G-2(f)(2) (emphasis added). By contrast, if a REMIC discovers a defect "that does not affect the status of an obligation as a qualified mortgage, then the obligation is always a qualified mortgage regardless of whether the defect is or can be cured." *Id.*

Defendants argue that the only defect that would "prevent[] the obligation from being a qualified mortgage" is the Real Property Defect: "[t]he mortgage was not in fact principally secured by an interest in real property," 26 C.F.R. § 1.860G–2(f)(1)(iii). (*See* Ds' Mem. 13-14.) By contrast, Relator argues that *any* defect prevents an obligation from being a qualified mortgage, unless the defect is of the *de minimis* nature of the following example in the regulation: "[i]f a sponsor represented that all mortgages transferred to a REMIC had a 10

14

percent interest rate, but it was later discovered that one mortgage had a 9 percent interest rate, the 9 percent mortgage is defective, but the defect does not affect the status of that obligation as a qualified mortgage," 26 C.F.R. § 1.860G–2(f)(2). (*See* R's Opp. 18.)[8]  Existing case law does not appear to resolve the parties' dispute.

I must read the regulation as a whole and consider its context. *See Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 155 (2d Cir. 1999). The plain text and structure of the regulation make clear that Defendants are correct, and that Relator's interpretation has no support. As an initial matter, the definition of a defective obligation applies only "[f]or purposes of [26 U.S.C. §§] 860G(a)(4)(B)(ii) and 860F(a)(2)," which are the sections of the statute that discuss the substitution or repurchase of defective obligations. The definition of a defective obligation does not refer to the portion of the statute that defines a "qualified mortgage," 26 U.S.C. § 860G(a)(3)(A). After defining a defective obligation, the regulation continues on to specify what must happen if a REMIC discovers that an obligation is defective. In doing so, the regulation refers to "qualified mortgage[s]" without further explaining or modifying that term. 26 C.F.R. § 1.860G–2(f)(2). On its face, therefore, nothing in the regulation alters or evinces any intent to alter the statutory definition of a qualified mortgage.

Rather, the regulation enumerates four defects that would render an obligation "defective." Only one of these, the Real Property Defect, negates the essential requirement of a qualified mortgage: that the mortgage is "principally secured by an interest in real property." *Id.* § 1.860G–2(f)(1)(iii). When the regulation is read as a whole, the four enumerated defects in subsection (1) inform the meaning of the reference in subsection (2) to a "defect . . . that, had it been discovered before the startup day, would have prevented the obligation from being a

---

[8] "R's Opp." refers to Plaintiff's [Relator's] Opposition to Defendants' Motion to Dismiss. (Doc. 37.)

15

qualified mortgage," *id.* 1.860G–2(f)(2). The most natural reading of a "defect . . . that . . . would have prevented the obligation from being a qualified mortgage" is as a reference to the Real Property Defect, which negates the essential element of a qualified mortgage. While Relator criticizes this reading of the regulation as conclusory, (*see* R's Opp. 18), Relator never offers another reading of the regulation that gives meaning to the phrase "defect . . . that . . . would have prevented the obligation from being a qualified mortgage." This reading is not conclusory; rather, it just gives plain meaning to the regulation when read in conjunction with the statutory definition of a qualified mortgage.

Furthermore, Relator misinterprets the regulation's example of a defect that does not prevent an obligation from being a qualified mortgage: "if a sponsor represented that all mortgages transferred to a REMIC had a 10 percent interest rate, but it was later discovered that one mortgage had a 9 percent interest rate, . . . the defect does not affect the status of that obligation as a qualified mortgage." 26 C.F.R. § 1.860G–2(f)(2). According to Relator, this is a *de minimis* exception to the general principle that defective obligations are not qualified mortgages. However, as Defendants explain, this is more naturally read as an example of the Customary Warranties Defect.[9] (*See* Ds' Mem. 18.) By its terms, the example pertains to a defective "representation or warranty given by the sponsor," 26 C.F.R. § 1.860G–2(f)(1)(iv): the sponsor has represented that the mortgage has an interest rate of 10 percent, when it actually has an interest rate of 9 percent. If this sort of representation is customary, then this provision serves

---

[9] In support of their argument, Defendants submitted a report from Moody's in which the ratings agency explains its criteria for evaluating representations and warranties in mortgage-backed securitizations. (*See* Doc. 35, Ex. 4.) I generally may not consider material beyond the four corners of the complaint in ruling on a motion to dismiss, without converting the motion into a motion for summary judgment, unless, for instance, the extra-record material is integral to the complaint and of undisputed authenticity and relevance. *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). The report submitted by Defendants does not bear on any of the factual allegations of the Complaint, *cf. Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000), and is more akin to legal authority that would assist the Court in interpreting the meaning of applicable regulations. Nonetheless, in an abundance of caution, I do not rely upon the Moody's report in reaching my conclusions.

16

to illustrate that mortgages suffering from the Customary Warranties Defect do not lose their status as qualified mortgages. Relator does not dispute in her memorandum of law that representations concerning the interest rate of the securitized mortgages are customary. Indeed, it is difficult to envision how it would be possible to offer securitized mortgages to investors without making a representation about the interest rates of the underlying mortgages. Nor does Relator identify the scope of the purported *de minimis* exception or explain what general principle the example is intended to illustrate if it is not an example of the Customary Warranties Defect. If the IRS meant for all defects to render mortgages unqualified with the exception of so-called *de minimis* defects it would have said so.

Thus, the regulation's plain meaning is that only the defect of not being principally secured by an interest in real property can prevent an obligation from being a qualified mortgage, but the other defects enumerated in the definition of a "defective obligation" cannot.[10]

### 3. The allegations of the Complaint do not support a reasonable inference that the Wells Fargo Trusts filed false returns.

The Complaint alleges that the mortgages owned by the Wells Fargo Trusts suffered from the Default Defect and the Customary Warranties Defect. (*See* Compl. ¶¶ 76-79.) As explained above, these defects do not affect the mortgages' status as qualified mortgages. Thus, as a matter of law, the defects expressly alleged in the Complaint do not bear on whether the Trusts satisfied the statutory definition of a REMIC. *See* 26 U.S.C. § 860D(a)(4). Therefore, the defects alleged in the Complaint do not support a reasonable inference that the Wells Fargo Trusts falsely claimed REMIC status on their 1066s.

---

[10] Because I conclude that the IRS did not construe the Internal Revenue Code to mean that all defective obligations other than those satisfying a *de minimis* exception are not qualified mortgages, I need not address the parties' arguments concerning whether the IRS could have permissibly done so under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). (*See* Ds' Mem. 15-19; R's Opp. 13-16.)

The Complaint does not allege that the mortgages owned by the Wells Fargo Trusts suffered from the Real Property Defect.  In her memorandum in opposition to the Motion to Dismiss, Relator argues that whether the mortgages were secured by an interest in real property is a mixed question of fact and law "that cannot be resolved on a motion to dismiss."  (R's Opp. 20.)  To survive the instant Motion to Dismiss, however, Relator must plead sufficient factual content for the Court to draw the reasonable inference that the Trusts' 1066 filings were false. *See Iqbal*, 556 U.S. at 678.  Because only the Real Property Defect affects a mortgage's status as "qualified," Relator must adequately plead that the mortgages held by the Wells Fargo Trusts suffered from this defect.  An obligation is principally secured by an interest in real property if it satisfies either the "80 percent test" or the "alternative test" enumerated in IRS regulations.  26 C.F.R. § 1.860G–2(a)(1).  The Complaint alleges no facts relating to the fair market value of the interests in real property (either at the time of origination or at the time the interests were transferred to the REMIC) that secure the mortgages held by the Wells Fargo Trusts.  *See id.* § 1.860G–2(a)(1)(i).  It also includes no allegations pertaining to the requirements of the alternative test.  *See id.* § 1.860G–2(a)(1)(ii).  Therefore, the allegations of the Complaint fail to support a reasonable inference that the mortgages owned by the Wells Fargo Trusts failed either of the tests for determining whether they were principally secured by an interest in real property.

Relator attempts to argue that mortgages voidable by fraud are not principally secured by an interest in real property.  (*See* R's Opp. 19-20.)  However, Relator fails to explain how this additional "non-voidable" requirement squares with the regulation's express provision that a mortgage is principally secured by an interest in real property if it passes either the 80 percent test or the alternative test.  Nor does Relator provide any authority for the proposition that a voidable mortgage is not secured by an interest in real property.  Indeed, under New York law, a

voidable contract, unless rescinded, is fully enforceable and imposes the same obligations on the parties as it would if it were not voidable.[11] *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001).

The Complaint therefore fails to plead facts supporting an inference that the mortgages held by the Wells Fargo Trusts were not "qualified" within the meaning of the Internal Revenue Code and its implementing regulations. Accordingly, the Complaint provides no allegations to support a reasonable inference that the Trusts did not satisfy the statutory definition of a REMIC. Because the mortgages were qualified mortgages, the Trusts were REMICs and their 1066s claiming federal tax-exempt status were not false. Thus, Relator has not stated a cause of action under the NYFCA because she has not alleged that Defendants made or used a false statement or record to avoid paying an obligation to the State and City. *See State of New York ex rel. Seiden*, 943 N.Y.S.2d at 40.

---

[11] The common-law principle that wrongdoers should not be permitted to use the protection of the law to benefit from their wrongdoing, (*see* R's Opp. 9-12 (citing, *inter alia*, *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232-33 (1959))), has no bearing on whether Relator has stated a claim upon which relief can be granted. To plead a reverse false claim under the NYFCA, Relator must allege, *inter alia*, that Defendants made or used a false statement or record. *See State of New York ex rel. Seiden*, 943 N.Y.S.2d at 40. Here, Relator has chosen to rely upon the Wells Fargo Trusts' 1066s as the allegedly false records giving rise to liability under the NYFCA. The 1066s were not false if the Trusts were entitled under the Internal Revenue Code and its implementing regulations to the tax-exempt status claimed on the forms. This does not mean that Defendants are somehow entitled to get away with, or to use the law to benefit from, the fraudulent origination and underwriting of subprime mortgages the Complaint alleges they committed. It simply means that the particular statement or record that the Complaint alleges to have been false was not actually false.

## V.  Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 33), and to close the case.

SO ORDERED.

Dated: March 19, 2015
      New York, New York

*Vernon Broderick*
Vernon S. Broderick
United States District Judge